**SACK & SACK, LLP**
*Attorneys for Plaintiff, Andrea Bischof*
70 East 55th Street, 10th Floor
New York, NY 10022
Tel.: (212) 702-9000

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANDREA BISCHOF,<br><br>                              Plaintiff,<br><br>       v.<br><br><br>CICC US SECURITIES, INC.,<br><br>                              Defendant. | No.: 22-cv-_____ ( ) ( )<br><br>**COMPLAINT**<br><br>**JURY DEMAND** |

Plaintiff Andrea Bischof ("Bischof" or "Plaintiff"), by her attorneys, Sack & Sack, LLP, as and for her complaint against CICC US Securities, Inc. ("CICC US," "The Firm," or "Defendant") alleges as follows:

## NATURE OF THE ACTION

1.      Bischof brings this action against CICC US to redress unlawful discrimination and retaliation in the terms, conditions, and privileges of her employment in violation of Title VII of the Civil Rights of 1964, 42 U.S.C.A §2000e ("Title VII"), Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), New York State Human Rights Law, Executive Law § 290 et seq. ("NYSHRL") and the Administrative Code of the City of New York § 8-101 et seq. ("NYCHRL") based upon her national origin, American, and race, Caucasian.

2.      As more fully set forth herein, Bischof has faced retaliation since her internal

discrimination complaints have been raised.  She has been marginalized and excluded from communications, workflows and business and career-enhancing opportunities.

3.      Specifically, Bischof suffered racial disparities in compensation and business opportunities at CICC US.

4.      As more specifically set forth herein, CICC US's discriminatory animus towards Bischof because she is of non-Chinese origin and the subsequent retaliation has resulted in diminished commercial opportunities, marginalization, excluding her from business functions, meetings and information, discrediting her efforts, paying her grotesquely lower than and disparately from her similarly situated peers of Chinese origin and ultimately destroying her career at CICC US with the implication of ruining her future professional participation within the financial services industry.

5.      Despite her stellar professional qualifications, proven investment skills, capabilities and competences, and unquestioned outstanding personal moral and ethical character spanning her long career in the investment sector, Bischof experienced blatant bias and discrimination.

6.      At all times relevant herein, Defendant's employees, managers, lawyers, and Human Resource specialists acted at the behest of Defendant during the course, and within the scope, of their employment with Defendant.

7.      Bischof seeks compensatory, liquidated, and punitive damages, the benefits she was denied, injunctive and declaratory relief, and appropriate legal and equitable relief, including liquidated damages and attorneys' fees.

<u>**PARTIES**</u>

8.      Plaintiff Bischof is a 31-year-old Caucasian woman who lives at 750 Driggs

Avenue, Brooklyn, NY 11211. She is a citizen of the United States.

9.      Defendant CICC is a Chinese company founded in 1995. CICC US opened its New York office in 2009.

10.     Upon information and belief, Defendant CICC US is a Delaware corporation with an office and place of business at 280 Park Avenue, 32nd Floor, New York, NY 10017.

11.     During all relevant times, Defendant CICC US was Plaintiff's employer within the meaning of all applicable statutes.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.  In addition, the Court has jurisdiction over Plaintiff's claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

13.     The Plaintiff has or will comply with all administrative prerequisites to this filing.

14.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(a).  Venue in this matter is properly laid in the District because the violations of the Plaintiff's federal and state civil rights occurred during the course of their employment at branch office locations in this District, because the Defendant does business in this District, and because most of the fact witnesses and evidence are common to or most convenient to this District.

## FACTS COMMON TO ALL COUNTS[1]
### PERSONAL AND PROFESSIONAL BACKGROUND

15.     Bischof is an American Citizen, and Caucasian, and she is protected under the Federal, State and City anti-discrimination statutes protecting employees.

---

1 All directly quoted statements, unless otherwise specified, are the sum and substance of such statements as recalled by Plaintiff.

16.     In 2013, Bischof graduated from the University of Chicago with a Bachelor of Arts in International Studies and Germanic Studies.

17.     Shortly thereafter, Bischof moved to New York City to begin her career in the financial services industry.

18.     From 2013 to 2015, Bischof was employed by Bank of America Merrill Lynch as a U.S. equity research salesperson.

19.     In 2015, China International Capital Corporation's ("CICC") then Head of Global Equities, Dr. Haizhou Huang ("Dr. Huang"), recruited Bischof to join CICC US Securities ("CICC US"), as an Associate in the Sales and Trading Department.

20.     CICC US is an SEC registered broker-dealer, a member of the Financial Industry Regulatory Authority ("FINRA") and the U.S. hub for the storied Chinese investment bank, CICC.

**BISCHOF JOINS CICC US AND EXCELS**

21.     In August 2015, Bischof began working for CICC US in its New York office, which is the main U.S. branch of CICC.

22.     Bischof commenced employment as an Institutional Equity Salesperson for CICC US Equities ("US EQ"), selling their services and research products, which cover Chinese equities, fixed income, macroeconomics, commodities, and market strategy.

23.     Since Bischof began working for CICC US in 2015, an overwhelming majority of her co-workers have been individuals of Chinese national origin.

24.     Throughout her tenure at CICC US as an Associate and Senior Associate, Bischof outperformed her peers. Her formal and informal performance evaluations and feedback have been exceptional.

25.     In 2019, because of her achievements, Bischof was promoted to Vice President.

26.     Throughout her tenure at CICC US as Vice President, Bischof's formal and informal performance evaluations and feedback have been exceptional compared to her U.S. and global peers.

27.     Her evaluations have always been highly ranked by her peers and by Thomas Nguyen ("Nguyen"), her manager.

28.     In Bischof's 2020 performance evaluation, Nguyen stated,

> **"Andrea [Bischof] had another fantastic year. She is the top ranked member of the U.S. team and is the second biggest producer. She has transformed her account base into a meaningful, diversified business. Andrea [Bischof] should be an Executive Director. Great salesperson. Tireless energy and passionate about the business. Fantastic team player."**

29.     In Bischof's 2021 performance evaluation, Nguyen stated,

> **"Andrea [Bischof] had a fantastic year. She is by far the biggest producer in the U.S., with over $5,000,000 in revenues. Andrea [Bischof] should be an Executive Director. Andrea is the most passionate, diligent, and disciplined salesperson we have. She is a great team player and leader."**

30.     Since joining CICC US in August of 2015, Bischof has had great success with generating revenue; cross-product and cross-border collaboration; helping to develop and drive strategic relationships with quality U.S. investors for CICC senior management; creating bespoke products that drive CICC's brand recognition in the U.S. and globally; and contributing significantly to team and talent development for US EQ.

31.     Bischof has had many critical successes with developing relationships and

5

generating meaningful revenue with U.S.-based clients that CICC US had no success with prior to Bischof's employment.

32.     For example, the asset manager, "Client 1", despite being an onboarded client "covered" by Senior sales, Shannon Wang ("Wang") —had insignificant revenues in 2015.

33.     After Bischof picked up coverage from Wang in late 2015, "Client 1" paid approximately $415,000 in 2016, more than doubled their revenue to approximately $880,000 in 2017 and paid just short of US$1,000,000 in 2018. "Client 1" became a top tier account for CICC US after just three (3) years of Bischof's coverage.

34.     "Client 1" remained a priority U.S. account in 2019 to 2020 with over half a million dollars in revenue in both years, before it was acquired by another company.

35.     "Client 1" was also a key strategic partner for the firm's management, with senior management members of CICC, such as former Global CEO, Mingjian Bi ("Bi"), former Global Head of Equities, Dr. Huang, Head of Asset Management, Mr. Yicheng Xu ("Xu"), and Chief Operating Officer, Dr. Gang Chu ("Dr. Chu"), meeting with various "Client 1" Portfolio Managers and Economist when CICC management visited the United States, as well as via phone call.

36.     Under Bischof's coverage, "Client 1" also became an important shareholder of CICC's Hong Kong-listed publicly traded shares.

37.     Another key account for Bischof is "Client 2," which in 2016, had US$4.5 billion raised in assets in one of the "biggest hedge fund launches ever." (Source: Financial Times)

38.     Bischof helped to open the "Client 2" account and has covered it since onboarding in 2016.

39.     Bischof traveled to China with "Client 2's" President. She organized bespoke

meetings for "Client 2's" President with high-level Chinese counterparts, companies, etc.

40.     Bischof organized meetings for "Client 2's" CEO to meet with CICC Management in an effort to sell "Client 2" its services in Equities and Research.

41.     After "Client 2" opened in with CICC in 2016, Bischof and other regional coverage took the account from zero (US$0) in revenue to US$2.15 billion in revenue in 2021.

42.     "Client 2", a global hedge fund, was the second largest U.S. client in 2021 (second only to one other China-focused hedge fund).

43.     "Client 3" is another example of a high-profile hedge fund launch that Bischof brought on board in 2016.

44.     Not only did the account generate noticeable revenues, but more importantly, Bischof built a meaningful relationship with "Partner 1", who has been an important source of insight for CICC Senior Executives, including Dr. Huang and Dr. Chu.

45.     Senior management members regularly requested calls with "Partner 1" to give them insights into U.S. markets, regulation, geopolitics, and macroeconomics.

46.     In addition to developing critical external and client relationships for CICC, Bischof was a champion of the firm's cross-border and cross-product collaboration, as demonstrated by her internal ranking peer review system, cited by Nguyen in her annual reviews.

47.     Bischof was a key resource and critical U.S. contact for cross-border collaboration, such as with CICC's Global Investment Banking franchise.

48.     For example, in August of 2018, China Tower Corporation (ticker: 788 HK) raised approximately $6.9 billion after pricing its initial public offering ("IPO"). CICC and Goldman Sachs were joint sponsors.

49.     Bischof was a critical part of the U.S. team that executed the IPO roadshow and

book building.

50.     China Tower's Chairman, Jilu Tong ("Tong"), expressed deep appreciation to just a few individuals on the U.S. team for helping to build a critical part of the book i.e., the American investor base that participated.

51.     Bischof was one of them. When Bischof was in Beijing, Tong invited Bischof to visit headquarters and hosted her for a special private lunch.

52.     Bischof was also the architect of many important CICC US products, all of which contributed significantly to building and expanding the Firm's franchise in the U.S., which is exactly what she was hired to do.

53.     For example, she collaborated with Research staff to create a "CICC Materials & Macro Trip", a bespoke week-long trip to China across many cities. This trip was attended by a handful of top CICC US, European, Hong Kong, and Singaporean clients. It became a recurring event, happening every six (6) months until the global pandemic halted it. This trip was a key factor in opening several US accounts in Bischof's earlier years at CICC.

54.     After the global pandemic hit and many domestic China and Hong Kong-based clients complained to CICC that they felt out of touch with global and the U.S. markets due to inability to travel, Bischof created "CICC Connect". She organized multiple calls with numerous panels of high-profile U.S. investors and senior CICC management, including Dr. Huang.

55.     After the initial successes of CICC Connect, these calls became ones that management requested Bischof plan for their domestic client base.

56.     After the pandemic began, she also created "CICC China Chats" which were well-attended group calls including virtual roadshows for corporates, several series of industry discussions with research analysts, calls with experts from China, etc.

57.     To her knowledge, no other salespersons in the U.S. have consistently created critical franchise- and business-building products such as these.

58.     Lastly, Bischof was critical to team building for CICC US EQ.

59.     Bischof was the main U.S. salesperson in further developing the summer internship program at CICC US. She was frequently asked to travel to campus recruitment sessions and participate in new hiring. She collaborated with senior management to assign interns to work with senior salespersons. She was tasked with assigning interns various projects to work on during their time with the firm.

60.     All of Bischof's contributions were recognized and well-known, up to the highest levels of the Firm's management.

61.     For example, as recently as June 23, 2022, on a call with all of CICC's US Staff, CICC's Global COO, Dr. Chu, singled Bischof's notable performance out: **"I always tells our [CICC's] people working on these things [referring to international hiring] I always say I did have a lot of inspiration from Andrea [Bischof] in the New York office. We see a lot of talented persons like Andrea [Bischof] around the world."** In reference to performance, he did not mention anyone else by name on the call.

### BISCHOF ENDURES DISCRIMANTORY ANIMUS

62.     Despite her successes at CICC US and contributions to overall business of CICC, Bischof was continuously passed over for a promotion to Executive Director.

63.     In 2020, Nguyen put Bischof up for promotion or "fast track" to the Executive Director title.

64.     The promotion in title comes with an approximately $50,000 increase to Bischof's annual base salary.

65.     A higher title like Executive Director with stellar performance like Bischof's

would likely have led to a higher bonus at year-end.

66.     Despite Nguyen's 2020 performance evaluation and his recommendation for Bischof's title promotion, CICC management declined to promote her without explanation to Bischof.

67.     In January of 2021, when Bischof inquired to Nguyen as to why she was not promoted to Executive Director, Nguyen told her that Dr. Huang responded to the promotion proposal that it would be difficult to promote Bischof fast-track this year due to the "work from home conditions" and committed to promoting her the following year, commenting that she was well-positioned and will have very strong case to get a promotion next year into Executive Director naturally (likely referring to a "normal track" promotion).

68.     Importantly, Wang—the aforementioned US EQ salesperson who is of Chinese origin—was promoted to Managing Director in that same cycle, despite the exact same "work from home conditions".

69.     The following year, in 2021, Nguyen once again put Bischof up for promotion to Executive Director in what would be considered "normal track."

70.     Despite Nguyen's 2021 stellar performance evaluation and promotion recommendation for Bischof, as well as the commitment from Dr. Huang the prior year, CICC again declined to promote Bischof without explanation.

71.     Shortly thereafter, when Bischof asked Nguyen what explanation he was given for the failure to promote her, Felicity Ting ("Ting"), a senior CICC Human Resources employee vaguely replied to Nguyen that **"Beijing [CICC] wanted to keep internal equity."**

72.     Despite this unwarranted career setback, Bischof continued to perform and excel.

73.     On April 18, 2022, Bischof had a call with Dr. Huang to discuss her performance

and compensation for 2021. Dr. Huang was Nguyen's direct manager at the time.

74.    Dr. Huang told Bischof, **"You are a key member of the CICC team who consistently makes great contributions."** Dr. Huang added, **"I am confident you will be ready for the promotion in 2022."**

75.    To date, and despite Bischof's exceptional performance and contributions, Bischof has not been promoted to Executive Director and there has been no mention of a future promotion to Executive Director from CICC management personnel.

76.    In the two years that Bischof was inexplicably denied a promotion, she was a top producer in the Firm's international offices and a key contributor to CICC's international expansion efforts.

77.    In the financial services industry, revenue generation, not ethnicity, Communist party affiliation, or national origin, is the principal determinant in whether an employee is promoted in role and their subsequent bonus compensation.

78.    Revenue generation has a significant impact on "total compensation" i.e., base salary plus bonus. On Wall Street, driving revenue is paramount.

79.    On Wall Street, being a member of a political party has nothing to do with one's career progression, unless one works at CICC.

80.    In order to be a member of the Chinese Communist Party, one must be of Chinese National Origin and a Chinese Citizen. Bischof cannot ever be a member of the Chinese Communist Party. Therefore, Bischof's career at CICC has and will continue to be adversely impacted due to her inability to become a member of the Chinese Communist Party.

81.    Specifically, in 2021, Bischof was the largest producer for the CICC US Equity team, bringing in approximately $700,000 more than the second largest producer, Ning Ding

("Ding"), then-Vice President and Bischof's equal, and approximately $2,500,000 more than third largest producer, Wang, then-Executive Director.

82.    Both Ding and Wang are of Chinese national origin.

83.    While Bischof was twice denied a promotion to Executive Director, Ding (a Chinese national) was promoted to Executive Director from Vice President.

84.    Similarly, Wang was promoted to Managing Director from Executive Director, even though Wang's production was approximately 50% less than Bischof's in the year she was promoted.

85.    The following charts reflect the revenue data for 2020 and 2021, respectively, both years Bischof was denied a promotion at CICC US despite her consistent delivery of a stellar performance and being a top revenue producer for CICC.

| Revenue Report 1/1/2020-31/12/2020 | | | | |
|---|---|---|---|---|
| Name | Role | Origin / Gender | Year-End Revenue (USD) | Rank |
| Ning Ding (ED) | Sales | Chinese / F | $5,005,340 | 1 |
| Andrea Bischof (VP) | Sales | Non-Chinese / F | $4,902,116 | 2 |
| Shannon Wang (ED) | Sales | Chinese / F | $2,963,534 | 3 |
| Ross Levin (ED) | Sales Trader | Non-Chinese / M | $387,950 | 4 |
| Mingshu Li (Analyst) | Sales | Chinese / F | $381,243 | 5 |
| Joanne Bagan (ED) | Sales Trader | Non-Chinese / F | $264,976 | 6 |
| Kris Luo (Analyst) | Sales | Chinese / M | $78,353 | 7 |
| Tim Yang (VP) | Sales Trader | Chinese / M | $33,327 | 8 |

| Revenue Report 1/1/2021-31/12/2021 | | | | |
|---|---|---|---|---|
| **Name** | **Role** | **Origin / Gender** | **Year-End Revenue (USD)** | **Rank** |
| Andrea Bischof (VP) | Sales | Non-Chinese / F | $5,223,907 | 1 |
| Ning Ding (ED) | Sales | Chinese / F | $4,573,471 | 2 |
| Shannon Wang (MD) | Sales | Chinese / F | $2,776,080 | 3 |
| Joanne Bagan (ED) | Sales Trader | Non-Chinese / F | $367,862 | 4 |
| Ross Levin (ED) | Sales Trader | Non-Chinese / M | $266,287 | 5 |
| Mingshu Li (Analyst) | Sales | Chinese / F | $224,373 | 6 |
| Tim Yang (VP) | Sales Trader | Chinese / M | $61,931 | 7 |
| Lona Sniderman (Analyst) | Sales | Non-Chinese / F | $14,594 | 8 |
| Kris Luo (Analyst) | Sales Trader | Chinese / M | $2,570 | 9 |

86.     As the above revenue reports demonstrate, Bischof was a top revenue generator for CICC US in 2020 and 2021. Nevertheless, CICC declined to promote Bischof because she was not of Chinese national origin.

87.     CICC's discrimination based on one's non-Chinese origin is even more apparent in the context of the dramatic change to the external environment in China and internal dynamics at CICC in the last several years.

88.     As early as 2016, CICC US's then Acting CEO, Elaine LaRoche ("LaRoche") indicated to Bischof and several other members of CICC US that there would increasingly be a focus on membership in and allegiance to the Chinese Communist Party ("the Party").

89.     In the last two to three years, the focus on the Party as part of the Firm's

operations has increased.

90.     Specifically, CICC has increasingly highlighted the significant role of "the Party" within the Firm and the importance of membership and adherence to the Party beliefs.

91.     For example, in a Chinese-only email sent to all of CICC's global equities staff on September 9, 2021, about the "Eight Bottom Lines" of Staff Behavior in the Equities Department, the #1 rule was that staff "must not violate the Party and state policies and major work arrangements".

92.     CICC US EQ's administrative assistant was required to translate the email for the team, since Beijing conveniently did not provide an English version of the memo.



93.     Recently, CICC established various committees, including the "Committee on Serving National Strategy" and the "Steering Group for Culture Development," both of which include members of the Party as significant leaders of these committees.

94.     Additionally, an employee recently suggested to CICC CEO, Zhaohui Huang

("Zhaohui"), that employees' Party-related work should be considered in year-end CICC performance evaluations.

95.     Shockingly, Zhaohui's Firm-wide written mandate and reply made clear that employee commitment and loyalty to the Communist Party in China would be an important factor in evaluating year-end performance when he stated:

> **"The Company attaches great importance to the development of primary-level Party building and the leading role of Party members. At present, Party members participate in democratic evaluation every year (the Party branch comprehensively evaluates Party members in terms of political literacy, organizational life, devotion to work, integrity and self-discipline, etc.). The result is an important factor in the existing talent development system. To further strengthen the standardized management of Party members, improve the quality of Party members, and create a positive environment for fulfilling duties, taking up responsibilities, and entrepreneurship, this year's performance evaluation will continue to take the feedback from democratic evaluation as an important factor for year-end performance evaluation."**

96.     This response from CICC's CEO Zhaohui proclaims to all that membership in the Chinese Communist Party confers an advantage to employees at CICC are members of the Party due to their Chinese national origin.

97.     In contrast, employees, like Bischof, who are not of Chinese national origin and could therefore never become members of the Chinese Communist Party, are severely disadvantaged solely because of this immutable characteristic.

98.     As a result, Bischof's career development, opportunities, and compensation

while at CICC US have been adversely impacted because of a practice that may give those of Chinese national origin additional advantages.

**ONGOING RETALIATION AT CICC US**

99.     At the time of drafting of this complaint, Bischof is still employed at CICC US.

100.     On July 7, 2022, after enduring continued discrimination at CICC US, Bischof decided to contact the undersigned counsel.

101.     As a result of Bischof speaking up about the discrimination she faced, Bischof has faced retaliation, which continued to intensify over the months following her complaint.

102.     Within two weeks of Bischof retaining the undersigned legal counsel to discuss her claims of discrimination, Bischof suffered severe and sustained retaliation, when she suddenly became the target of an "investigation," as well as multiple retaliatory measures carried out by various colleagues and managers at the Firm.

103.     On July 19, 2022, Bischof learned that Joanne Bagan ("Bagan") and Wang, the two interim co-Heads of U.S. Equities, were actively scrutinizing Bischof's expense reports from May and June 2022. Notably, the expense reports submitted by Bischof's colleagues of Chinese origin were approved without any additional review for May and June 2022.

104.     On August 10, 2022, Bischof was informed that Bagan was **"asking about [Bischof's] July charges."**

105.     At all times, Bischof has followed all CICC and CICC US protocol in submitting her expense reports, including seeking pre-approval for expenses and staying within the allotted budget, per Firm policy.

106.     On July 28, 2022, CICC US emailed Bischof's CICC US work email stating that it had "recently" come to the Firm's attention that she had **"engaged in a serious breach of [her] obligations to CICC US Securities, Inc."**

107.    Further, the email stated, **"[t]he Social Media Policy defines Firm- sponsored electronic communication technologies to include (1) CICC US corporate email, (2) Bloomberg IM for those authorized, and (3) landline or cell phones."**

108.    Specifically, the email alleged that Bischof had sent Firm emails to her personal email address via blind copy to her Bloomberg email address in violation of Firm policy **"in order to gain an unlawful competitive advantage."**

109.    This is bizarre, notably because Bischof could not be in competition with CICC US, her own employer.

110.    Moreover, and equally important, Bischof had permission to send emails from her Bloomberg email address to her personal email because of the sustained and well-documented, chronic lack of technological systems capability from CICC US.

111.    On or about March 2020, the World Health Organization declared a global pandemic. As a result, CICC US directed all staff to work from home pursuant to the Firm's work-from-home mandate.

112.    Prior to the Firm's work-from-home mandate, Bischof had conducted CICC US business by using a Virtual Private Network ("VPN") on her personal laptop.

113.    For security purposes, if Bischof and all other employees are not in a CICC or CICC US office, Firm applications, programs, and data can only be accessed via VPN on a laptop or through the Citrix application Secure Mail on a mobile phone.

114.    After the work-from-home mandate in 2020 due to the COVID-19 pandemic, the Firm provided employees with a laptop and printer for use in performing their job responsibilities.

115.    However, the laptop and printer provided by the Firm could not print directly

17

from the CICC VPN.

116.    VPN and Citrix also do not permit a Firm user to print materials to an external printer—such as the one that Bischof was given by the firm in July of 2020 for remote work—while using those two platforms. Therefore, to print any materials while offsite (prior to the pandemic) or working remotely, Bischof and other employees were instructed by CICC tech support to email the materials to their personal or Bloomberg email.

117.    VPN and Citrix are not always accessible if employees are traveling somewhere with no or poor Wi-Fi service or if the applications were malfunctioning. Therefore, throughout Bischof's tenure at the Firm, she would email materials to her personal email via Bloomberg to ensure that she had access to pertinent Firm information for relevant client calls, meetings, etc. At no time prior to her filing a complaint did she ever receive instruction to not email materials to her personal or Bloomberg email accounts.

118.    The only way to print work materials while staff worked from home, was to email documents to their personal email accounts. Bischof could not access Bloomberg on the firm-provided laptop outside of the VPN, thus preventing her from printing directly from Bloomberg message.

119.    Notably, when Bischof asked whether there was any way to print with the firm hardware provided without sending documents to personal email addresses, the Firm's own Information Technology team advised her to continue sending materials to her personal email to print as there was no other way.

120.    Many CICC US employees complained about the lack of functionality.

121.    However, this was not just an issue created by the global pandemic. As mentioned, Bischof has used this exact process of emailing since she started working at CICC

many years ago, because of these limitations of CICC's own technology infrastructure.

122.     To date, VPN does not support printing documents other than to printers in the CICC US office, which are not always accessible given employees are not in the office daily due to continued COVID protocols, and, for the majority of 2020 to 2021, employees were not in the office at all.

123.     As depicted below, the VPN (ras2.ciccus.com) and the options for printing do not include the printer that CICC US IT sent Bischof for use while working from home.



124.     To date, the mobile app (Citrix Secure Mail) does not support printing as depicted

in the screenshot below:



125.    The fact that this process is being questioned conveniently after Bischof's discrimination complaint against the Firm clearly highlights the retaliatory nature of the Firm's actions against Bischof.

126.    In none of the almost seven (7) years that Bischof has worked for CICC US has the firm inquired as to why she was sending emails to her Bloomberg.

127.    This demonstrates the incompetence and lack of control of the Compliance and Information Technology departments much more than the purported breach of policy by Ms. Bischof, who was conducting her actions since 2015 to build the equities business and normal operations for the Firm.

128.    Further, this July 28, 2022, alleged non-compliance email flies in the face of the email sent by CICC US Head of Legal and Compliance Shan Gao ("Gao"), on February 3, 2020, which acknowledged that employees would be required to handle and download confidential information at non-office locations using non-office computers. In the "Compliance Notice – Handling Confidential Information While Working Remotely," Gao stated,

**"During this telecommuting circumstance, the U.S. Staff who Work Remotely by using office or non-office computers to access CICC US' mailboxes, networks, or remotely log on to office computers at non-office locations for office work may frequently contact, download, and edit various documents containing Confidential Information (defined herein). To ensure no Confidential Information is compromised or misused, the U.S. Staff are required to handle any Confidential Information with strict care."**

129.    To the best of her ability, with the significant restraints presented due to the insufficient technology systems put in place and due to the unprecedented global pandemic, Bischof handled all Confidential Information, including that which was printed and not printed, with strict care and did not use it to gain any unfair advantage or harm the Firm in any way.

130.    The Firm's allegation that Bischof has breached the Firm's Social Media Policy is undeniably retaliatory, considering that senior CICC US and Firm management regularly use unapproved Chinese platforms WeChat and WeCom (WeChat Enterprise) to communicate regarding Firm business.

131.    For example, on June 30, 2022, Wang, interim Co-Head of U.S. Equities, recently invited traders Ross Levin and Tim Yang, and her Co-Head of U.S. Equities Joanne Bagan, into a WeChat messaging group "CICC US – MACRO" for the purpose of discussing Firm business.

132.    Instead of admonishing Wang for breaching Firm policy by using an unapproved method of communication to conduct Firm business, Bagan replied with a **"Thank you."**



133.    On July 20, 2022, Wang, again, contacted CICC US Equities Department staff on a WeChat group called "EQ Team" to discuss Firm business.



134.    On July 20, 2022, these same details from WeChat were later that day sent using

the Firm email, because no one from the US EQ team replied to Wang in the WeChat chat.

135.    Bischof replied to this email which included the same Firm employees from the WeChat group, including Bagan, asking that management refrain from using WeChat to communicate with the CICC US team.



136.    Ironically, on July 29, 2022—on the day the undersigned wrote to the attorney for CICC raising the additional issue of retaliation, and the day after the Firm emailed Bischof regarding Bischof's purported breach of the Social Media Policy—Wang messaged the "CICC US – MACRO" WeChat group containing twenty-two (22) CICC and CICC US employees to cease using WeChat immediately.

137.    She specifically mentioned Bischof by name in this message—and not one of the other seven (7) CICC US employees in the chat—with the intention of intimidating Bischof, a

subtle threat that Wang was aware of the charge against Bischof of alleged Social Media Policy

breach.



138.     The Firm's sudden and selective enforcement of its Social Media Policy after its

accusation that Bischof had breached the Social Media Policy is evidenced by the WeChat

message sent after the fact by several research analysts to WeChat groups in early August 2022.

139.     On August 11, 2022, one analyst commented in Mandarin in the "CICCUS Food

& Beverage" group chat that:

> **"On July 30, Mr. Zhou [allegedly referring to Mr. Guang Zhou, CICC**
>
> **Research Department Management] sent a notice. Today, all colleagues**
>
> **are requested to check the group you have established or are in again.**
>
> **If there are American colleagues (listed below), please clear them**
>
> **immediately.  Thanks!"**

(Note: English is sourced from Google Translate).



140.    Following Zhou's July 30th instructions to all CICC Research analysts, Bischof and other CICC US Equities front office staff were removed from many CICC-related WeChat group chats.

141.    On August 11, 2022, one analyst informed Bischof that she was removing Bischof and several colleagues from their WeChat group and subsequently did.

*(Rest of page intentionally left blank)*



142.    On August 22, 2022, Bischof ran into CICC US Investment Banker Tian Wang ("Tian") in the hallway of the office.

143.    Tian mentioned that they, referring to CICC US Investment Banking staff, were being removed from all WeChat group chats that they were in.

144.    On August 23, 2022, Bischof was also removed from all WeChat groups with CICC's Hong Kong-based Equity Capital Markets ("ECM") colleagues.

145.    The Firm's selective and sudden enforcement of its Social Media Policy shortly after Bischof's complaint of discrimination is further evidence of CICC's retaliation.

146.    Based on the timeline of the WeChat removals as stated above, it in fact appears that Bischof's complaints and requests that management, including Wang, keep all work-related requests on email and not WeChat led to a broader initiative at the firm to stop the ongoing use of WeChat and social media by all CICC US employees.

**BISCHOF FILES WITH THE EEOC**

147.    On August 1, 2022, because of CICC US's continued discriminatory animus towards her, Bischof filed a complaint with the EEOC.

148.    On that same day, the undersigned counsel emailed a copy of the EEOC filing to CICC US's counsel.

149.    Since the filing of her EEOC complaint, Bischof has been blocked from effectively performing her job.

150.    On August 6, 2022, counsel for CICC unilaterally sought to have Bischof sign a confidentiality preference agreement, barring her from pursuing her claims or discussing them with anyone.

151.    When Bischof refused, on August 16, 2022, CICC's counsel proposed that in exchange of a comprehensive agreement to not sue CICC, and Bischof's agreement to immediately resign from her gainful employment, she would be paid $114,023.  CICC counsel explained that this sum represented 75% of Bischof's own, previously awarded bonuses in the form of deferred compensation.  And the payment terms would last over the course of several years.  Said differently, CICC sought to fund the consideration for a release in its favor with Bischof's own money.

152.    On August 9, 2022, CICC intentionally excluded Bischof from an All-Staff meeting being held on August 12, 2022, at which Zhaohui, CICC's CEO, was the key speaker. The email stated, **"Employees from all regions [were] invited to participate by videoconferencing from local office or watching live broadcast on WeCom."**

153.    The key agenda item was "Remarks by CEO Zhoahui on 'Strengthening compliance management and carrying forward CICC culture" as well as a 20-minute Q&A session.

154.    Following this email, Bischof inquired, **"1) Whether there would be English translation; 2) How CICC US Staff could participate; and 3) Whether there would be a transcript or recording, given the meeting was to be held at 4:30 AM EST."**

155.    Following Bischof's questions regarding the meeting, Bischof was informed around noon on August 10, 2022, that CICC US participation was cancelled **"due to the timing difference."**

156.    This reason is pretext.  All meetings emanating from China, 12 hours ahead of New York's time zone, are open to all CICC employees, globally, regardless of the time difference.

157.    In addition, even if Bischof chose to wake up early to join, which she and other colleagues have done in the past even with the time difference, Bischof would not be allowed to participate.

158.    On August 11, 2022, Bischof emailed CICC US Acting CEO Sean Shi ("Shi") to inquire as to why CICC US employees could not join this call, whether anyone from the U.S. offices would be privy to the call, and whether the information on the call would be provided to U.S. employees.

159.    Shi did not respond.

160.    On August 12, 2022, Bischof tried to join the call via the Zoom link provided previously in the hopes that Bischof could still participate, but she was unable to join.

*(Rest of page intentionally left blank)*



161.    On August 15, 2022, Bischof emailed Shi to inquire about the exclusion of herself and CICC US staff from the August 12, 2022, meeting. Bischof also inquired about the retaliation she had been facing since her initial complaint regarding the discrimination she faced at CICC US.



162.     Incredibly, Shi responded, **"Given the hour of the meeting, 4:30am in New York and 1:30am in San Francisco, CICC headquarters decided that for the well-being of its U.S. staff, it would not ask any US staff to attend at that hour. As reflected in the emails below, the decision by headquarters related to all US staff and had nothing to do with you."**

163.     However, this was the first time the Firm had prevented CICC US from joining a meeting that was held in the early morning hours.

164.     For example, for the most recent "EQ Department meeting" that was held on June 10, 2022, at 17:00 Beijing time / 5:00 AM Eastern Time, CICC US EQ was not banned from attending. In fact, several New York team members joined the call.

165.     Since she joined CICC US in 2015, Bischof regularly woke up at 4:00 AM Eastern Time to begin work. Prior to the global pandemic, Bischof sent emails as early as 4:30 AM Eastern Time and was in the office around 5:00 AM Eastern Time for most of her tenure at the firm.

166.     Thus, this sudden and inexplicable decision to ban U.S. staff from attending a critical meeting can only be explained by assuming they did not want Bischof on this call because the CEO would discuss the role of the Party in both critical compliance functions and culture development at the Firm.

167.     If the aforementioned "well-being" was in fact the reason for this decision, it does not make sense that is there no replay, transcript, or notes to inform the CICC US staff of what they missed on the critical, important All-Staff call.

168.     To the best of Bischof's memory, historically, there was never an outright blockage of CICC US participation. In addition, there was generally an attempt to provide either translation or some form of notes for CICC US staff for critical meetings that they could not be

a part of due to timing, lack of translation, etc.

169.     The Firm's ongoing retaliation in excluding Bischof from critical Firm meetings makes it impossible for Bischof to perform her job responsibilities, including functions related to the All-Staff meeting agenda such as risk management or expenses control ("strengthening compliance") and team building ("carrying forward CICC culture") properly.

170.     Further, Bischof's outgoing colleague Ding informed Bischof on August 8, 2022, that the EQ group was in the process of hiring a new Senior Salesperson for the CICC US team. Her colleague Kris Luo ("Luo") further confirmed this on August 19, 2022.

171.     On August 23, 2022, when Bischof was in the office, the front desk secretary at CICC US informed Bischof that she had booked several rooms for later in the week for the EQ team for the interviews they were doing.

172.     Again, Bischof had been informed of no interviews.

173.     Since Bischof joined CICC US in 2015, she had been involved in interviewing almost every person hired to the U.S. Sales or Trading desks, including even the least senior level positions, such as interns.

174.     This was a critical part of building the culture of a small team.

175.     To date, interim Co-Heads Bagan and Wang have not yet informed Bischof of any new hiring or interviewing that CICC US EQ is doing, which has resulted in denying Bischof mentoring opportunities for summer interns as well as purposefully excluding Bischof from critical team building functions and normal business operations.

176.     According to other EQ colleagues Ross Levin ("Levin") and Luo, CICC US currently has summer interns for 2022. Bischof has not been informed nor introduced to them. Prior to Bischof's complaint against the Firm, Bischof developed and led the summer internship

program for the past few years.

177.    Moreover, Bischof's colleague, Ding, resigned from the firm in early August.

178.    Under normal circumstances, when a senior salesperson leaves, their accounts, especially the high-paying ones, are distributed amongst remaining salespersons, especially senior sales.

179.    Since Ding left two weeks ago, there has been no communication whatsoever from Bagan and Wang about account reassignment and no indication that they will have Bischof—the second most senior salesperson on the desk after Ding's departure—pick up coverage of any of Ding's former accounts.

180.    This is an obvious example of limiting Bischof's career development, business development, and future opportunities.

181.    On August 16, 20220, while discussing a deal with Hong Kong colleagues related to an account, Matthews Asia ("Matthews"), Bischof responded that Matthews did not have active U.S. coverage since Ding had left. Matthews was Ding's account, and to Bischof's knowledge, Ding's accounts had not been distributed yet.



182.    Following Bischof's email discussion, Bagan commented to Levin in a private traders' chat that she did not know why Bischof stated that Matthews did not have coverage because Wang was on the Matthews account.



183.    In fact, Bischof had stated that Matthews did not have coverage because it was what Bischof thought was true at that moment, since there had been no communication by Bagan or Wang with Bischof regarding transition of coverage and/or picking up any account coverage of Ding's.

184.    Bischof inquired immediately after on August 16th as to whether coverage of Ding's accounts had been re-assigned and received no answer from Bagan or Wang. She followed up on the inquiry on August 17th and 18th.

185.    Neither Bagan or Wang even acknowledged the inquiry about account transition and coverage from when the email was sent on August 16, 2022 through August 22, 2022., i.e., seven (7) whole days.

186.    On August 22, 2022, Bischof had emailed Shi again about both the All-Staff Meeting, as well as to inform him of ongoing retaliation happening in US EQ, which was still under the leadership of Bagan and Wang.



187.    Shi did not respond immediately to the email. However, it appears that he informed Bagan and Wang that they should respond to emails from Bischof, as Bagan finally responded to Bischof's several follow-up emails after eight (8) days of silence.

188.    On the morning of August 23, 2022, Bagan finally responded:

> **Thank you for your concern about Ning's former accounts. They are being taken care of. Shannon and I would very much like you to focus on your own accounts at the moment and ensure they are being properly covered. You will be notified about account reviews in due course, along with everyone else.**

189.    Not transferring coverage of any of Ding's accounts to Bischof, the only other

senior salesperson on the desk other than Wang, is not only uncommon business practice in equities but also hindering Bischof's further career development.

190.    However, as shown in the above revenue metrics for 2020 to 2021, if Wang were to add all of Ding's revenue to her own, she would then be the largest producer instead of the third largest, as she was for the last two years despite her most senior title.

191.    This type of ongoing discrimination against the only non-China salesperson is further proof of CICC's discriminatory practices.

192.    Furthermore, on August 23, 2022, Shi finally responded to Bischof's multiple follow-up emails about the All-Staff meeting after she had sent multiple follow-up emails.

193.    Shi responded:

> **"Shortly after the meeting, information (including a translations) concerning the August 12 meeting was posted to intranet [CICC's internal portal]. The information has been available to all US staff since its posting-even though it addresses non-US related issues. AS always, to the extent you or any other employees have any compliance-related questions, those questions may be raised with your direct supervisor, or compliance directly."**

194.    Bischof, in fact, had raised it with compliance directly. Shan Gao ("Gao"), CICC US's Head of Legal and Compliance, was copied on Bischof's original email to Shi on August 11, 2022, ahead of the All-Staff meeting, as well as the follow-up emails Bischof sent to Shi.

195.    Bischof's supervisors—allegedly Wang and Bagan—did not, at any point, give guidance to the team as to the All-Staff Meeting, how to get a replay, how to get a transcript, etc.

196.    When Bischof checked the "Intranet" site, she could not find anything related to

a transcript or replay, only a picture and announcement that the All-Staff meeting had happened, as follows:



197.    After Bischof indicated to Shi and Gao directly via email that Gao and CICC US Legal and Compliance did not respond nor give any guidance on a compliance related All-Staff meeting, Gao's retaliation towards Bischof also continued, on the morning of August 24, 2022:

*(Rest of page intentionally left blank)*

36



198.    This was not the first time that Bischof had heard about the retaliatory nature of Gao's business practices. In the past, several colleagues had told her that Gao did not like employees asking questions about compliance policies that she had communicated.

199.    This retaliatory treatment and the intimidation tactics employed by senior management make it impossible for Bischof to conduct her job and business practices in a normal fashion.

200.    As a consequence of the aforementioned, Bischof alleges that she has been dramatically underpaid compared to her Chinese peers Ding and Wang as a result of CICC US's action to purposefully stymie her ability to dutifully perform her job duties in the Institutional Equity Sales role and intentional failure to promote Bischof to Executive Director. The difference in annual salary is at least $50,000 dollars less per year. The difference in annual bonus is at least several hundred thousand dollars less per year.

201.     As a consequence of Defendant's unlawful actions, Bischof has suffered damages as described herein.

202.     Bischof brings this action to seek redress of CICC US's violations of law, which has caused her to suffer damages.

## CLAIMS AND DAMAGES

Based upon the above allegations, Plaintiff maintains the following legal claims against Defendant:

## COUNT ONE
**(DISCRIMINATION ON THE BASIS OF NATIONAL ORIGIN AND RACE IN VIOLATION OF TITLE VII)**

203.   Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

204.   Defendant's discriminatory and then retaliatory behavior of Plaintiff was due to Plaintiff's national origin, American, and race, Caucasian, in addition to her being retaliated against.

205.   Defendant's animus towards Plaintiff's national origin and race is revealed in instances where similarly situated Chinese employees were treated differently than Plaintiff in respect to their terms, conditions, and privileges of employment.

206.   Defendant has undertaken these discriminatory practices willfully or with reckless disregard for Plaintiff's rights protected under Title VII.

207.   Complaining about and opposing the discriminatory misconduct proved futile for Plaintiff because CICC US's unlawful behavior continued. This prompted Plaintiff to separately file charges of discrimination with the EEOC for discrimination and retaliation.

208.   The aforementioned acts of Defendant constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of her employment because of her national origin and race, and in retaliation against her in violation of the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

209.   As a proximate result of Defendant's aforementioned discrimination against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past

and future earnings, bonuses, deferred compensation and other employment benefits.

210.   As a further proximate result of Defendant's actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

211.   As a further proximate result of Defendant's actions and retaliation taken because of Plaintiff's national origin and race, Plaintiff has and will continue to suffer incidental and consequential damages and expenses.

212.   As a result of the foregoing, Plaintiff is entitled to recover from Defendant, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest.

213.   In committing the acts alleged herein, Defendant, acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages in an amount to be proven at trial to adequately punish Defendant, and to deter Defendant from continuing and repeating such conduct in the future.

## COUNT TWO
### (RETALIATION IN VIOLATION OF TITLE VII)

214.   Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

215.   Based upon the aforementioned facts, Plaintiff had reasonable belief that Defendant was engaged in unlawful conduct under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

216.   Plaintiff acted in opposition to such unlawful conduct by making good faith

claims and/or complaints of discrimination to Defendant and appropriate authorities, including the EEOC.

217.     Defendant had actual knowledge of Plaintiff's activities in respect of making good faith claims and/or complaints of discrimination to Defendant and appropriate authorities, including the EEOC.

218.     As a proximate result of Plaintiff's activities in respect of making good faith claims and/or complaints of discrimination to Defendant and appropriate authorities, including the EEOC, Defendant engaged in adverse treatment of Plaintiff.

219.     The aforementioned acts of Defendant constitute unlawful retaliation against Plaintiff in violation of the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

220.     As a proximate result of Defendant's aforementioned retaliation against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

221.     As a further proximate result of Defendant's actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

222.     As a further proximate result of Defendant's actions taken because of Plaintiff's national origin and race, Plaintiff has and will continue to suffer incidental and consequential damages and expenses.

223.     As a result of the foregoing, Plaintiff is entitled to recover from Defendant, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit

sharing, costs, attorney's fees and prejudgment interest.

224.    In committing the acts alleged herein, Defendant, acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages in an amount to be proven at trial to adequately punish Defendant, and to deter Defendant from continuing and repeating such conduct in the future.

**COUNT THREE**
**(DISCRIMINATION ON THE BASIS OF NATIONAL ORIGIN AND RACE IN VIOLATION OF SECTION 1981)**

225.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

226.    Defendant's discriminatory behavior was made as a direct result of Plaintiff's national origin, American, and race, Caucasian.

227.    Defendant's animus towards Plaintiff's national origin and race is revealed in instances where similarly situated employees of Chinese origin were treated differently than Plaintiff in respect to of her terms, conditions, and privileges of employment.

228.    The aforementioned acts of Defendant constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of her employment because of her national origin and race in violation of the provisions of the Section 1981.

229.    As a proximate result of Defendant's aforementioned national origin and race discrimination against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, and other employment benefits.

230.    As a further proximate result of Defendant's actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name

and reputation.

231.    As a further proximate result of Defendant's actions taken because of Plaintiff's national origin and race, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation, anguish, and other incidental and consequential damages and expenses.

232.    As a result of the foregoing, Plaintiff is entitled to recover from Defendant, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, retirement contributions, costs, attorney's fees and prejudgment interest at no less than 9%.

233.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount in compensatory damages to be determined at trial from Defendant, in addition to all other amounts sought herein.

234.    In committing the acts alleged herein, Defendant acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages to adequately punish Defendant, and to deter Defendant from continuing and repeating such conduct in the future.

## COUNT FOUR
### (RETALIATION IN VIOLATION OF SECTION 1981)

235.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

236.    Defendant CICC US through its acts and those of its agents, violated Section 1981 by retaliating against Bischof.

237.    Plaintiff was subjected to discrimination in her workplace, which she reported to an agent/agents of Defendant.

238.    As a result of reporting the discrimination, she was retaliated against such as being treated rudely and differently than her comparators, as well as being excluded from meetings and interviews and losing out on accounts, which had the effect of creating a hostile work environment.

239.    Plaintiff continues to suffer ongoing retaliation at CICC US.

240.    In committing the acts alleged herein, Defendant acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages in an amount to be proven at trial to adequately punish Defendant and to deter Defendant from continuing and repeating such conduct in the future.

## COUNT FIVE
### (DISCRIMINATION ON THE BASIS OF NATIONAL ORIGIN AND RACE IN VIOLATION OF NYSHRL)

241.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

242.    Defendant's discriminatory behavior was made as a direct result of Plaintiff's national origin, American, and race, Caucasian.

243.    Defendant's animus towards Plaintiff's national origin and race is revealed in instances where similarly situated employees of Chinese origin were treated differently than Plaintiff in respect to of her terms, conditions, and privileges of employment.

244.    The aforementioned acts of Defendant constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of her employment because of her national origin and race in violation of the provisions of the NYSHRL.

245.     As a proximate result of Defendant's aforementioned national origin and race discrimination against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, and other employment benefits.

246.     As a further proximate result of Defendant's actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

247.     As a further proximate result of Defendant's actions taken because of Plaintiff's national origin and race, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation, anguish, and other incidental and consequential damages and expenses.

248.     As a result of the foregoing, Plaintiff is entitled to recover from Defendant, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, retirement contributions, costs, attorney's fees and prejudgment interest at no less than 9%.

249.     As a result of the foregoing acts, Plaintiff is entitled to recover an amount in compensatory damages to be determined at trial from Defendant, in addition to all other amounts sought herein.

250.     In committing the acts alleged herein, Defendant acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages to adequately punish Defendant, and to deter Defendant from continuing and repeating such conduct in the future.

## COUNT SIX
### (RETALIATION IN VIOLATION OF NYSHRL)

251.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

252.    Defendant CICC US through its acts and those of its agents, violated NYSHRL by retaliating against Bischof.

253.    Plaintiff was subjected to discrimination in her workplace, which she reported to an agent/agents of Defendant.

254.    As a result of reporting the discrimination, she was retaliated against such as being treated rudely and differently than her comparators, as well as being excluded from meetings and interviews and losing out on accounts, which had the effect of creating a hostile work environment.

255.    Plaintiff continues to suffer ongoing retaliation at CICC US.

256.    In committing the acts alleged herein, Defendant acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages in an amount to be proven at trial to adequately punish Defendant and to deter Defendant from continuing and repeating such conduct in the future.

## COUNT SEVEN
### (DISCRIMINATION ON THE BASIS OF NATIONAL ORIGIN AND RACE UNDER NYCHRL)

257.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

258.    Defendant's discriminatory behavior during Plaintiff's employment was made as a direct result of Plaintiff's national origin, American, and race, Caucasian.

259.     Defendant's animus towards Plaintiff's national origin and race is revealed in instances where similarly situated employees of Chinese origin were treated differently than Plaintiff in respect to of their terms, conditions, and privileges of employment.

260.     The aforementioned acts of Defendant constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of her employment because of her national origin and race in violation of the provisions of the NYCHRL.

261.     As a proximate result of Defendant's aforementioned national origin and race discrimination against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, and other employment benefits.

262.     As a further proximate result of Defendant's actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

263.     As a further proximate result of Defendant's actions taken because of Plaintiff's national origin and race, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

264.     As a result of the foregoing, Plaintiff is entitled to recover from Defendant an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees, and prejudgment interest at no less than 9%.

265.     As a result of the foregoing acts, Plaintiff is entitled to recover an amount in compensatory damages to be determined at trial from Defendant, jointly and severally, in addition to all other amounts sought herein.

266.    In committing the acts alleged herein, Defendant acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages to adequately punish Defendant and to deter Defendant from continuing and repeating such conduct in the future.

### COUNT EIGHT
**(RETALIATION IN VIOLATION OF NYCHRL)**

267.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

268.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

269.    Defendant CICC US through its acts and those of its agents, violated NYCHRL by retaliating against Bischof.

270.    Plaintiff was subjected to discrimination in her workplace, which she reported to an agent/agents of Defendant.

271.    As a result of reporting the discrimination, she was retaliated against such as being treated rudely and differently than her comparators, as well as being excluded from meetings and interviews and losing out on accounts, which had the effect of creating a hostile work environment.

272.    Plaintiff continues to suffer ongoing retaliation at CICC US.

273.    In committing the acts alleged herein, Defendant acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages in an amount to be proven at trial to adequately punish

Defendant and to deter Defendant from continuing and repeating such conduct in the future.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court order the following relief in favor of Plaintiff:

I.      A judgment declaring that Defendant discriminated and retaliated against Plaintiff in violation of Title VII of the Civil Rights of 1964, 42 U.S.C.A §2000e ("Title VII"), New York State Human Rights Law, Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), Executive Law § 290 et seq. ("NYSHRL") and the Administrative Code of the City of New York § 8-101 et seq. ("NYCHRL");

II.     An order enjoining Defendant from engaging in the wrongful practices alleged herein;

III.    An award of compensatory damages in an amount to be determined at trial, including, damages in respect of loss of wages, promotional opportunities, and salary and benefits had her employment not been interfered with;

IV.     An award of back pay and front pay, together with all other benefits to which Plaintiff is entitled, with prejudgment interest;

V.      An award of punitive damages in an amount to be determined at trial;

VI.     An award of prejudgment interest, costs and attorney's fees; and

VII.    Such other and further relief that the Court may deem just and proper.


Dated: New York, New York
August 25, 2022

                        Respectfully submitted,

                        **SACK & SACK, LLP**

        By:     Jonathan S. Sack, Esq.

                70 East 55th Street, 10th Floor
                New York, New York 10022
                Tel.: (212) 702-9000
                Fax: (212) 702-9702
                *Attorneys for Plaintiff*
                *Andrea Bischof*